1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                 NORTHERN DISTRICT OF CALIFORNIA

7

8  ALEXANDRE L. HOCHSTRASER,              No. C 12-2481 SI (pr)

9              Petitioner,               **ORDER DENYING PETITION FOR
                                         WRIT OF HABEAS CORPUS AND
10      v.                               GRANTING CERTIFICATE OF
                                         APPEALABILITY**
11  MATTHEW CATE, warden,

12              Respondent.

13  _____/

14

15         Alexandre Hochstraser filed this *pro se* action seeking a writ of habeas corpus under 28

16  U.S.C. § 2254.  The matter is now before the court for consideration of the merits of the habeas

17  petition.  For the reasons discussed below, the petition will be denied.

18

19                              **BACKGROUND**

20      Procedural History

21         Hochstraser was found guilty by a jury in Santa Clara County Superior Court of one count

22  of first degree murder, Cal. Penal Code § 187.  Clerk's Transcript ("CT") at 553, 556-58.  On

23  March 20, 2008, Hochstraser was sentenced to state prison for 25 years to life.  CT at 663-66

24         Hochstraser appealed.  The California Court of Appeal affirmed the conviction and the

25  California Supreme Court and United States Supreme Court denied petitions for review.

26  Hochstraser's state habeas petitions were also denied.

27  ///

28  ///

United States District Court
For the Northern District of California

Hochstraser then filed this action, seeking a writ of habeas corpus. On July 19, 2012, this court issued an order to show cause on the claims that: (1) his right to due process was violated because the evidence was insufficient to support the first degree murder conviction, i.e., evidence of premeditation was absent; (2) his right to effective assistance of counsel was violated when counsel (a) failed to object to improper use of the automobile exception rule; (b) failed to investigate relevant social history of violence, psychiatric problems, and meningitis; (c) failed to present witnesses known to support petitioner's testimony; and (d) failed to have the jury admonished after an upheld objection; and (3) the prosecutor engaged in misconduct by repeatedly stating his own opinion in closing argument, misstating evidence, making pejorative references to petitioner and criticizing defense counsel to the jury. Respondent filed an answer and Hochstraser filed a traverse.

### The Crime

The court presents the facts as set forth in the trial transcript and in the briefing of the parties.

In 2001, the victim, Dolores Gonzalez ("Dee"), was a single mother with one adult daughter, Christie. Reporter's Transcript ("RT") at 576, 594. Dee worked for Mission College and was heavily involved with the union at her job, Service Employees International Union ("SEIU"). RT at 576, 586, 1109-12. In 2001, Hochstraser was working at De Anza College in Cupertino and was also heavily involved with SEIU. RT at 650, 1065.

In January 2001, while Hochstraser was married to Kathy Tullius, he became romantically involved with Donna Bradshaw, another employee at De Anza College. RT at 655-56, 732, 740. In April 2001, Bradshaw learned that Hochstraser was married; her relationship with him soon ended. RT at 659-65.

In June 2001, Hochstraser attended a union conference in San Diego, where he met Dee, who was also attending. The two became romantically involved almost immediately. RT at 576-77, 597-98, 612-13, 622-23, 1088, 1127. The romance continued after both returned to the

2

Bay Area and their respective jobs.  RT at 598-99, 1090.  Hochstraser was still married to Tullius, and still occasionally called Donna Bradsaw at home and occasionally spoke to her at work.  RT at 668-69, 673-74.  Hochstraser told a friend about his involvement with Dee and that he had "screwed things up" with Donna Bradshaw by starting with Dee.  RT at 1127-28.

Around April 2002, Dee became pregnant with Hochstraser's child.  RT at 580-81, 747-48.  In June 2002, Hochstraser's wife discovered the affair; they separated and she later field for divorce.  RT at 740, 747, 1128.

In late 2002, Donna Bradshaw learned about Dee and the baby.  RT at 676-77.  Hochstraser told Bradshaw that he had made a mistake and wished things were different.  RT at 680-81.  Hochstraser told a friend that he "just made the biggest mistake of his life and that he wanted the baby, but he didn't want to be with Dee anymore and that he was in love with Donna [Bradshaw]."  RT at 1093-94, 1108.  He also told the friend that Dee was possessive and jealous, constraining him and placing a lot of pressure on him.  RT at 1094.  Hochstraser also told his friend that he did not want Dee raising their child because she had done a poor job raising her other child, Christie.  RT at 1095-96.

Hochstraser's divorce became final in January 2003, and he moved in with Dee and Christie.  RT at 740, 1053-54.  Daniel, Hochstraser's child with Dee, was born in February 2003.  RT at 1054-55.  Around September 2003, Dee began complaining about Hochstraser's lack of financial support and not helping with the household chores.  RT at 581-82.  Hochstraser complained to a friend that Dee was becoming more possessive and that they argued over simple things.  RT at 1116-17.  He also stated to another friend that he did not agree with the manner in which Dee was raising Daniel with respect to discipline.  RT at 718-19.

Sometime after Daniel's birth, Hochstraser again stated to a friend that he still cared for and loved Donna Bradshaw.  RT at 1128-29.  He also stated that he would never love another woman the way he loved Bradshaw.  RT at 1129.  Hochstraser stated that his sex life with Dee had fallen off significantly and she would tell him that she could kick him out if she wanted and he would never see Daniel again.  RT at 1131, 1159.  At the end of 2003, Hochstraser and Dee

came by a friend's office and, when Hochstraser stepped away for a moment, Dee told the friend that she did not want Hochstraser romantically involved with Donna Bradsaw or to even talk to her. RT at 1155-56.

By late 2004, it was apparent that Dee no longer wanted a physical relationship with Hochstraser, but wanted him to be there for Daniel to help her raise him because she did not want to be a single mother again. RT at 582, 602, 617, 644-45. However, Hochstraser still wanted a physical relationship with Dee. RT at 602.

In March 2005, Hochstraser told a friend that something was going to change in his relationship with Dee and he wanted to borrow money to hire a lawyer and fight for custody. RT at 1131-32. On two or three occasions in the spring of 2005, Hochstraser told a friend about the possibility of Dee winding up missing and told the friend to say he does not know anything, if asked. RT at 1132-33. The friend did not take the statements seriously and attributed them to frustration. *Id*.

On May 30, 2005, Hochstraser was speaking to his friend and when asked how he was doing, replied, "I'll be better when I lose 200 pounds." RT at 1133-34. Dee was five feet, eight inches and weighed approximately 250 pounds, but the friend thought Hochstraser was joking. RT 1161-62. On June 3, 2005, Hochstraser spoke with Donna Bradshaw for a few minutes and asked how she was doing. RT at 683-86.

On Sunday morning June 5, 2005, Hochstraser called his ex-wife around 9:36 am and asked permission to come over to her house to pick up some tools including a Sawzall reciprocating saw. RT at 754-57. Hochstraser was observed driving erratically at about 9:45 am to 9:55 am. RT at 1068-75. Later that same Sunday, June 5, 2005, Dee's daughter Christie called police and asked them to go Dee's and Hochstraser's apartment to perform a welfare check; she said there had been a domestic violence incident the night before, and she had been unable to contact Dee since. RT at 423.

The following facts are taken from a published opinion of the California Court of Appeal:

On June 5, 2005, at approximately 9:46 p.m., a woman who identified herself as Christy Gonzales called the Santa Clara Police Department's nonemergency

number and spoke with a dispatcher.  She said she lived in Sacramento and gave the dispatcher her phone number.  She told the dispatcher that her mother lived with a boyfriend, Alex Hochstraser, and their two-year-old son, Daniel, and gave the address.  She said she had "just found out that there was some domestic violence that happened today and now my mom um, is unavailable; no one can find her and the boy is home with the father and I'm just wondering if there's anything um, I can do or you can do or some sort of a report can be filed, you know, on her behalf ... ?"  She added that a half hour earlier, her grandmother had notified her that "they were in a physical fight and he did strike her."  Christy said her grandmother had "been trying to get in contact with my mother all day."  She had "no idea at all" where her mother might have gone, but no one had heard from her.  The dispatcher informed Christy that somebody would "go out there and check on the child and they also um, see what we can do."  Christy thanked the dispatcher.

. . .

The officers identified themselves as Santa Clara police officers [and entered the apartment].  There was absolutely no response.  Using their flashlights, they systematically searched the apartment from front to rear for any occupants inside, to check on their welfare.  Inside the last bedroom checked, Officer Liepelt saw defendant sitting on a bed.  The room was "completely dark" and the bed sheets were on the floor.  There was a cold draft inside the room coming from an open window.  A cell phone, which was turned off, was on the bed next to defendant's leg and there was a landline phone on a table next to the bed.  When the police officers entered the room, defendant looked up and pulled a pair of ear plugs from his ears; he looked surprised.

Officer Liepelt told defendant that they were there to conduct a welfare check of his girlfriend and his son.  Since they were not in the apartment, Liepelt asked defendant about their whereabouts.  Defendant said that [Dee] was not home.  He acknowledged that the previous night he and [Dee] had had an argument during which they pushed each other, she fell, and she cut her chin.  He had redness on his face and cuts on his hands, which he said were injuries he received during the argument.  After the fight, each of them reported the incident to his or her family.  Defendant said [Dee] had left earlier that morning after the argument and he let her go.

He drove his son, Daniel, up to his mother's house in San Francisco that morning.  He said he had not seen [Dee] since that morning and that he had tried calling her on her cell phone once but she did not answer the phone.  He said he dropped his car off and took his mother's Jetta.  While the police were questioning defendant, the landline phone rang two or three times.  Defendant made no attempt to answer it.  The answering machine picked up the call, but Officer Liepelt could not hear what the caller said because the volume was all the way down.

According to Officer Liepelt, defendant's demeanor was withdrawn, emotionless, and unconcerned about [Dee's] safety or welfare.  [Sergeant] Brauer described defendant's affect as "spacey."  He testified: "I felt like he was almost like looking through me.  It was weird.  I just had a really weird feeling about his whole demeanor, it was very strange."  When the police started asking him pointed questions, defendant "seemed very evasive and extremely vague about what had happened during the day, where [Dee] might be."  He began answering questions with questions; he never answered a question, he just repeated it.

5

Officer Earl Amos went to the apartment of his own accord, arriving at the apartment with Officer Eric Lagergren, a trainee, about five minutes after the others. Sergeant Brauer told him that they were doing a welfare check, looking for a female and a small child. Officer Amos began "poking around, looking to see if there's any evidence of anything" in plain view, which is one of the things he does whenever he enters a residence. As he walked through the apartment, he was struck by the smell of fresh bleach or cleanser and paint which was at odds with the unkempt condition of the apartment. He also noticed three or four Sawzall blades sitting on the arm of the couch. One was used, as indicated by the fact that the painted area in the middle of the blade was all worn off. The others had no such wear. Sergeant Brauer noticed more blades on the kitchen table. The bathroom was clean and smelled very strongly of bleach.

. . .

Sergeant Brauer asked defendant if the police could look inside the Jetta [automobile]. Defendant asked why they wanted to look into it. Brauer explained that "we were investigating the disappearance of two people and we needed to be very thorough." Defendant responded that he would rather they not search the car.

Sergeant Brauer made the decision to look inside the Jetta . . . . There was a tarp on the floor and several Rubbermaid containers stacked on the rear seat, and one on the front seat. The containers were opaque. When Sergeant Brauer saw the containers, he wondered "why [defendant] had a bunch of plastic boxes." . . . .

. . .

Sergeant Brauer instructed Officer Amos to enter the Jetta, which was unlocked. Officer Amos did so and then opened the snap-on top of a container that was 18 to 20 inches deep, 18 inches wide, and 30 inches long. Inside the container was a garbage bag, which he also opened. Inside the bag Officer Amos found "a mound of human flesh." He stopped searching and notified Sergeant Brauer who also looked inside and saw the human flesh of what looked like an adult.

Officer Amos shut the car door.

From the landing, Officer Liepelt watched as Amos opened the container. Liepelt could not see what was inside the container, but Sergeant Brauer told Officer Liepelt that he had found body parts. Sergeant Brauer instructed Officer Liepelt to handcuff defendant. Liepelt then walked back into the apartment and ordered Officer Lagergren to handcuff defendant.

*People v. Hochstraser*, 178 Cal. App. 4th 883, 887-92 (2009) (footnotes omitted).

The body parts belonged to Dee.[1]  RT at 484-87, 506-508, 780-82.  Blood samples from the saw blades and a knife that was found were matched to Dee.  RT at 847-49, 1024-27.  Dee's body had been cut into ten pieces; her head had been cut off by use of a both a knife and saw and

---

[1] Daniel, their child, was found safe at Hochstraser's mother's house. *Hochstraser*, 178 Cal. App. 4th at 892.

each of her breasts had been cut off.  RT at 508-20.  Dee had died as a result of multiple blunt force injuries to her head.  RT at 520-25.  It was "very likely something large and heavy was used to strike the left side of her head multiple times."  RT at 524.

A further search of the apartment revealed "a paper plate with a figurine of a person that had different body parts that were not attached."  RT at 911.  Police found a bag that contained clothing with a little blood on it and a stain of Dee's blood on the mattress in the master bedroom.  RT at 814, 842.  Another bag was found that contained a shower head, a white trash can with a blood stain on it, white latex gloves, rags, painter's coveralls, a scrub brush and a Sawzall saw blade.  RT at 893-97.  The master bedroom also had a repaired gouge in one wall.  RT at 974, 986.  Several doors to the bedroom, closets and bathroom showed areas of mismatched paint.  The bathroom appeared recently painted and had a strong chemical like bleach smell.  RT at 819, 975, 1013-1014.  The bathroom also had areas of apparent blood stains, and the use of a chemical agent revealed many other possible blood stains.  RT at 976-80, 98.  The head of the shower was missing and one of the sliding shower doors was off its track.  RT at 992.  Marks on the bathroom floor were consistent with a reciprocating saw.  RT at 999.

A search of Hochstraser's office found a drawing of a woman with a detached head.  RT at 573.  During his marriage, he enjoyed the books and movies for American Psycho.  RT at 742-46.  A witness testified that the book contained graphic torturing of hookers and other things.  RT at 742.  Hochstraser once said to another person that he could get rid of his ex-wife by just killing her, RT at 750-52, though Hochstraser never directly threatened his ex-wife.  RT at 753.  While in custody, Hochstraser sent letters to Donna Bradshaw and attempted to call her.  RT at 686-89, 692, 700-02.

The defense case primarily consisted of Hochstraser's testimony.  He testified that even after Dee stopped sexual relations between them, he never lost his desire for her, despite her gaining considerable weight.  RT at 1257-58.  While she continued to reject him, he never cheated on her.  RT at 1258-59.  Hochstraser wanted the family to stay together and suggested counseling, though Dee refused repeated suggestions.  RT at 1248-49.  The relationship

1    deteriorated in the end of 2004.  RT at 1261.

2        On Saturday, June 4, 2005, their child Daniel was having medical problems.  The three

3    of them returned from various difficult and painful tests at the hospital at around 9:00 pm that

4    night.  RT at 1297-99.  Dee wanted to give Daniel a hot bath, but Hochstraser though it was a

5    bad idea as Daniel had a fever.  RT at 1298-1300.  Despite his objections, Dee proceeded to start

6    a hot bath for Daniel. RT at 1300-01.  Hochstraser grabbed Daniel and turned to leave the

7    bathroom.  RT at 1301-02. Dee grabbed him on his chest, and as Hochstraser pushed her away,

8    he became off balance and ended up hitting Dee in chin and lip with his open hand.  RT at 1302-

9    03.  The altercation ended immediately; and after Daniel was put to bed, they each called their

10   mother to say what had happened.  Hochstraser slept in another room.  RT at 1303-06.

11       Hochstraser barely slept that night, and then next morning Dee wanted to be driven to a

12   beauty salon for an appointment.  RT at 1308-10.  Hochstraser refused to drive her and said she

13   should spend time with Daniel; they began to argue.  RT at 1310-16.  Hochstraser accused Dee

14   of being a bad parent to Christie, and Dee became enraged.  RT at 1317.

15       Hochstraser stated that Dee began grabbing him and hurting him and punching him on

16   the side of the head, knocking off his glasses.  RT at 1318-19.  Hochstraser, who was five-foot

17   nine-inches and 170 pounds, was unable to push Dee, who weighed about 250 pounds, away,

18   so as she grabbed him harder he punched her in the stomach.  RT at 1318-19, 1392.  They fell

19   in opposite directions.  RT at 1319.  Hochstraser was scared for his life because Dee was

20   threatening to "beat the living shit out of you, I'll kill you, I'll get you."  RT at 1319.  He then

21   reached into the closet to remove the breaker bar and blindly swung it, afraid for his life, but not

22   wanting to kill Dee.  RT at 1320.  He hit her with the bar on the side of the head.  RT at 1320,

23   1398.  He then hit her again in the head with the bar and she may have fallen back on the bed.

24   RT at 1320, 1400.  He may have hit her a third time with the bar as she was falling on the bed.

25   RT at 1320, 1402-03.  He may have hit her a fourth time.  RT at 1408-09.  Next, Hochstraser just

26   stood there, knowing Dee was dead.  He decided he needed to get Daniel out of the house.  RT

27   at 1321.

28

He then took Daniel to his mother's house.  RT at 1323.  On the way he stopped by an ATM and used Dee's card to withdraw cash.  RT at 1324-25.  He also threw the breaker bar that had been used to strike Dee out of the car .  RT at 1326-27.  He arrived at his mother's house at about 9:00 am.  He switched cars with her so he could hide Dee's body in the trunk of his mother's car.  RT at 1327.  He realized he would not be able to take Dee's body out of the apartment so he thought about dismembering her.  RT at 1327.

He went to his ex-wife's house to pick up some tools, drove back to the apartment, took Dee into the bathroom and began the dismemberment.  RT at 1328, 1352, 1440-42.  He stated he was not thinking clearly.  RT at 1327.  However, he cleaned up the area because he did not want anyone know he killed Dee. RT at 1431.

Hochstraser admitted to lying to police when they entered the apartment, and he testified that he should have told the truth that he killed her in self defense.  RT at 1452-53.  He read the book American Psycho, but did not dismember Dee to emulate the protagonist of that book and did not remember much of the book.  RT at 1329-30, 1457-60.  He also stated he has an inappropriate sense of humor and he was joking when making remarks about Dee going missing or losing 200 pounds.  RT at 1332, 1354, 1385-86.  He only contacted Donna Bradshaw while in custody because he heard she had cancer.  RT at 1332.

### JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state

judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c).  The parties do not dispute that the state judicial remedies were exhausted for the claims in the petition.

### STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state

court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

A.    Sufficiency of the Evidence

Hochstraser contends the evidence was insufficient to support the first degree murder conviction because evidence of premeditation was absent.

Standard

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364 (1970).  A convicted individual who alleges that the evidence in support of his conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a claim for the violation of due process.  *See Jackson v. Virginia*, 443 U.S. 307, 321 (1979).  A court reviewing an insufficiency of the evidence claim does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1993).  Instead, "the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012) (per curiam).  The reviewing court may not substitute its judgment for that of the jury; "it is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam) .  Under *Jackson*, a jury's credibility determinations are entitled to near-total deference.  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

When a sufficiency of the evidence claim that was rejected in state court is reviewed on federal habeas corpus, it is subject to a "twice-deferential standard." *Parker*, 132 S. Ct. at 2152.  First, relief must be denied if, viewing the evidence in the light most favorable to the prosecution, there was evidence on which "*any* rational trier of fact could have found the

1   essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at

2   319).  Second, the court must apply 28 U.S.C. § 2254(d)(1)  to the state court's decision and

3   determine whether its application of *Jackson* was objectively unreasonable.  *Id.*

4       The *Jackson* standard must be applied with explicit reference to the substantive elements

5   of the criminal offense as defined by state law.  *Jackson*, 443 U.S. at 324 n.16.  However, "the

6   minimum amount of evidence that the Due Process Clause requires to prove the offense is purely

7   a matter of federal law."  *Coleman*, 132 S. Ct. at 2064.

8

9       <u>Analysis</u>

10      Petitioner alleges that there was insufficient evidence to find premeditation in the killing

11  of the victim.  This claim was denied by the state court without a reasoned decision.  This court

12  must conduct an independent review of the record to determine whether the state court clearly

13  erred in its application of controlling federal law, and consequently, whether the state court's

14  decision was objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

15      The jury was instructed as follows regarding premeditation:

16      The defendant is guilty of first degree murder if the People have proved that he
        acted willfully, deliberately, and with premeditation.  The defendant acted
17      willfully if he intended to kill.  The defendant acted deliberately if he carefully
        weighed the considerations for and against his choice and, knowing the
18      consequences, decided to kill.  The defendant acted with premeditation if he
        decided to kill before committing the act that caused death.
19
        The length of time the person spends considering whether to kill does not alone
20      determine whether the killing is deliberate and premeditated.  The amount of time
        required for deliberation and premeditation may vary from person to person and
21      according to the circumstances.  A decision to kill made rashly, impulsively, or
        without careful consideration is not deliberate and premeditated.  On the other
22      hand, a cold, calculated decision to kill can be reached quickly.  The test is the
        extent of the reflection, not the length of time.
23
24  RT at 1607.

25      Sufficiency claims are judged by the elements defined by state law.  *Jackson*, 443 U.S.

26  at 324 n. 16.  California courts have identified three common indicators that a killing was

27  deliberate and premeditated: (1) planning, (2) motive, and (3) a particular or exacting manner

28  of killing.  *People v. Anderson*, 70 Cal. 2d 15, 27 (1968).  However, later courts have held that

12

not all three of these indicators need to be present to sustain a finding of premeditation and deliberation.  *People v. Garcia*, 78 Cal. App. 4th 1422, 1427 (2000).  The individual *Anderson* factors may be taken in balance, and merely serve as a guidelines to assess whether the elements of premeditation and deliberation are present.  *People v. Perez*, 2 Cal. 4th 1117, 1125 (1992).

Hochstraser argues the only evidence regarding premeditation was a receipt for when he bought the plastic bins that were used to hold the body parts.  Pet. at 5.  However, there was additional evidence presented at trial.  As set forth above, Hochstraser repeatedly stated that becoming involved with the victim and having a baby with her was a big mistake as he loved another woman.  Hochstraser also told a friend that the victim could wind up missing and the friend should say he did not know anything.  Hochstraser also said that he would be better when lost 200 pounds, referring to the victim's weight.

While Hochstraser testified that he killed the victim in self-defense, the evidence and his testimony also indicated that he hit her three to four times in the head with a heavy metal bar and never attempted to obtain medical attention for her.  He also switched cars in order to obtain a car with a trunk; he then retrieved a saw to dismember the body, and he thoroughly cleaned the scene of the killing and lied to police about the victim's whereabouts.

Although the evidence of premeditation and deliberation in this case "was admittedly not overwhelming, ... 'we need not be convinced beyond a reasonable doubt that defendant premeditated the murder[ ]. The relevant inquiry on appeal is whether "'*any* rational trier of fact' 'could have been so persuaded.' [Citations.]"  *People v. Wharton*, 53 Cal. 3d 522, 546 (1991).

There was sufficient evidence, based on Hochstraser's own comments, the manner of the killing with several blows to the head, the aftermath and his testimony regarding the incident, for the jury to find premeditation.  To the extent that Hochstraser asks this court to re-weigh the credibility findings made by the jury and reach a different conclusion, the court is unable to comply.  The Supreme Court has made clear that, "under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."  *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *see also Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility

determinations are ... entitled to near-total deference under *Jackson*.")  That the jury did not credit Hochstraser's testimony and ultimately believed the other evidence that pointed to premeditation will not lead to habeas relief.  This claim is denied.

B.      Ineffective Assistance of Counsel

Hochstraser contends that trial counsel was ineffective for: (1) failing to object to improper use of the automobile exception rule; (2) failing to investigate relevant social history of violence, psychiatric problems, and meningitis;  (3) failing to present witnesses known to support petitioner's testimony; and (4) failing to have the jury admonished after an upheld objection.

Standard

The Sixth Amendment to the United States Constitution guarantees not only assistance, but effective assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.*  To prevail on an ineffective assistance claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, *id*. at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, *see id.* at 691-94.

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 689).  The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the two apply in tandem, review is doubly so."  *Id.* at 788 (quotation and citations omitted).

14

When § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id.*

A difference of opinion as to trial tactics does not constitute denial of effective assistance, *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available.  *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).  Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances.  *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  Furthermore, trial counsel cannot be ineffective for failing to raise a meritless motion.  *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005);  *see, e.g., Hebner v. McGrath*, 543 F.3d 1133, 1137 (9th Cir. 2008) (finding counsel's failure to object to admission of defendant's prior sexual misconduct as propensity evidence not ineffective where evidence would have been admitted to show common plan or intent).

Analysis

1.    Automobile Exception

Hochstraser argues that trial counsel was ineffective for failing to argue that the search of the car was an improper application of the automobile exception rule.

Background

Prior to trial, trial counsel filed a motion to suppress and challenged the seizure of evidence on several theories, but did not specifically raise the automobile exception rule.  CT at 130-54.  Trial counsel argued that the initial entry into the house was a warrantless intrusion that was not supported by probable cause with exigent circumstances.  CT at 139-41.  Trial counsel argued that the search was not justifiable as a community caretaker search or protective

1   sweep exception to the warrant requirement.  CT at 142.  Trial counsel further argued that even

2   if the initial entry was upheld, the extended search and seizure of evidence was illegal after

3   Hochstraser informed police where the child was, thus the seized evidence must be suppressed.

4   CT at 150-52.  Finally, trial counsel argued that the evidence recovered from the car could not

5   be admitted pursuant to the inevitable discovery doctrine.  CT at 235-37.

6          The trial court agreed with trial counsel that the warrantless search of the apartment was

7   not justified under the exigent circumstances exception to the Fourth Amendment and the

8   inevitable discovery doctrine was inapplicable.  *Hochstraser*, 178 Cal. App. 4th at 893.  Yet, the

9   trial court upheld the searches under the community caretaking exception and noted "while

10  conducting their welfare check for [Dee] (and Daniel) inside the apartment, the police developed

11  probable cause to believe that [Dee] (or Daniel) had met with foul play and that evidence relating

12  to their disappearance would be found in defendant's mother's car; thus, the search of the car and

13  its containers was justified by the automobile exception to the warrant requirement. (*California*

14  *v. Acevedo* (1991) 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619.)"  *Id*.

15         On direct appeal, Hochstraser asserted that trial counsel was ineffective for failing to

16  argue that the automobile exception was inapplicable to the facts of the case.  Answer, Ex. C at

17  51-59.  The California Court of Appeal chose to address the argument on the merits regarding

18  the automobile exception and did not address the ineffective assistance of counsel argument.

19  *Hochstraser*, 178 Cal. App. 4th at 903, n. 12.[2]  The California Court of Appeal found the

20  automobile exception fully applicable to the car where Dee's dismembered body was found.

21         Defendant challenges the search of the house and the car on two grounds.  First,
        he argues that even if the initial entry was justified, subsequent searches of the
22      apartment and the car were "illegally extended to a criminal investigation, beyond
        the limitations of any community caretaker justification to render emergency aid
23      to someone inside the home."  He also argues that the automobile exception to the
        warrant requirement did not apply to the search of defendant's mother's Jetta,
24      which was parked in the carport below defendant's apartment.  For the reasons
        explained below, we reject both arguments.
25
26         . . .

27         [2] Hochstraser renewed his ineffective assistance of counsel claim in a habeas petition to
    the California Supreme Court that was denied without comment.  Answer, Exs. H, I.
28

. . . . To the extent defendant is arguing that probable cause to search the Jetta for evidence of a crime relating to the disappearance of [Dee] and Daniel was lacking, we disagree.  In our view, the evidence discovered by the police in plain view following their entry into the apartment supplied ample probable cause to search the car for evidence of crime.

Relying primarily on language in *California v. Carney* (1985) 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (*Carney*), defendant next argues that the police were required to obtain a search warrant before searching the car in which [Dee's] dismembered body parts were found, because the car was parked at or near defendant's apartment in a carport and was therefore not subject to the automobile exception to the warrant requirement.  Again, we disagree.

In *Carney*, police searched a Dodge Mini motor home that was parked in a downtown San Diego parking lot after receiving an unconfirmed tip that the motor home was being used in the exchange of marijuana for sex, watching a youth enter the motor home with defendant and emerge after one and one-quarter hours, detaining the youth and learning from him that he had received marijuana in exchange for sexual contact with defendant.  The warrantless search yielded marijuana and paraphernalia used in drug sales.  (*Carney*, *supra*, 471 U.S. at ¶. 387–388, 105 S.Ct. 2066.)  The Court "granted certiorari to decide whether law enforcement agents violated the Fourth Amendment when they conducted a warrantless search, based on probable cause, of a fully mobile 'motor home' located in a public place." (*Id*. at p. 387, 105 S.Ct. 2066.)  The Court held that the Fourth Amendment was not violated because "the pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility justify searches without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met." (*Id*. at p. 392, 105 S.Ct. 2066.)

Defendant's argument depends entirely on the following sentence in *Carney*, which immediately follows the above-quoted passage.  "*When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes—temporary or otherwise—the two justifications for the vehicle exception come into play.*" (*Carney*, *supra*, 471 U.S. at ¶. 392–393, 105 S.Ct. 2066, italics added.) . . . .

Defendant argues: "Conversely, however, when a vehicle is not being used on the highways, and when it is found stationary at a place regularly used for residential purposes"—like an apartment building's carport—"the automobile exception does not 'come into play.'" We disagree.  Viewed in the context of the whole opinion, it is obvious that the *Carney* court did not intend such a meaning.  As the discussion following the disputed sentence makes even more clear, the twin justifications which make the automobile exception applicable to a vehicle "come into play" whenever a car is capable of being used as a car, i.e., for transportation, regardless of whether it happens to be parked in a carport next to a residence, on a public street in front of a residence, or in a downtown parking lot, as in *Carney*.

Rejecting the argument that the Court should "distinguish his vehicle from other vehicles within the exception because it was capable of functioning as a home," (*Carney*, *supra*, 471 U.S. at p. 393, 105 S.Ct. 2066) the Court observed: "In our increasingly mobile society, many vehicles used for transportation can be and are being used not only for transportation but for shelter, i.e., as a 'home' or

'residence.' To distinguish between respondent's motor home and an ordinary sedan for purposes of the vehicle exception would require that we apply the exception depending upon the size of the vehicle and the quality of its appointments. Moreover, to fail to apply the exception to vehicles such as a motor home ignores the fact that a motor home lends itself easily to use as an instrument of illicit drug traffic and other illegal activity.... [¶] Our application of the vehicle exception has never turned on the other uses to which a vehicle might be put. The exception has historically turned on the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation. These two requirements for application of the exception ensure that law enforcement officials are not unnecessarily hamstrung in their efforts to detect and prosecute criminal activity, and that the legitimate privacy interests of the public are protected. Applying the vehicle exception in these circumstances allows the essential purposes served by the exception to be fulfilled, while assuring that the exception will acknowledge legitimate privacy interests." (*Carney*, *supra*, 471 U.S. at ¶. 393–394, 105 S.Ct. 2066, fn. omitted.) In a footnote, the court declined to decide whether the "automobile exception" should apply "to a motor home that is situated in a way or place that objectively indicates that it is being used as a residence. Among the factors that might be relevant in determining whether a warrant would be required in such a circumstance is its location, whether the vehicle is readily mobile or instead, for instance, elevated on blocks, whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient access to a public road." (*Id.* at p. 394, fn. 3, 105 S.Ct. 2066.)

In this case, defendant argues that the car was not "mobile or even potentially mobile because the police had the key." In our view, the car was "mobile" within the meaning of *Carney*. It can be inferred from the record that defendant's mother's car was an ordinary sedan, subject to governmental regulation and capable of being used as transportation on public streets. The automobile exception to the warrant requirement was fully applicable to the car in which [Dees'] dismembered body was found.

*Hochstraser*, 178 Cal. App. 4th at 901-05 (footnotes omitted).


Discussion

To succeed on this claim Hochstraser must demonstrate both that trial counsel was deficient and that, had the automobile exception argument been presented, there is a reasonable probability that the result of the proceedings would have been different. Hochstraser is unable to meet this burden and the claim is denied.

Hochstraser is hard pressed to demonstrate that trial counsel was deficient, based on the extent of the motion to suppress and the numerous theories used to challenge the seized evidence and that trial counsel was partly successful with the motion. In any event, Hochstraser is unable to show he was prejudiced. This is not a situation where trial counsel failed to raise the

automobile exception and Hochstraser never had an opportunity for the issue to be addressed. The trial court specifically found that the automobile exception applied and issued an extensive written decision outlining the reasons.  CT at 269-74.  The California Court of Appeal upheld the reasoning in a published decision and the California Supreme Court denied several petitions for review regarding the issue.  This court does not have to theorize on how the trial court would have ruled had the issue had been raised, as the trial court specifically ruled on the issue.  Thus, Hochstraser cannot show prejudice for trial counsel's failure to present this argument, as the trial court found the automobile exception applied.

Nor can Hochstraser demonstrate the California Supreme Court's silent denial of his claim was an unreasonable application of established Supreme Court authority, namely *Strickland* and to a lesser extent *California v. Carney,* 471 U.S. 386 (1985).  While the claim before this court is one of ineffective assistance of counsel, which as discussed above must fail, Hochstraser presents several arguments regarding the underlying Fourth Amendment claim, contending that the state courts unreasonably applied *Carney*.  While *Stone v. Powell*, 428 U.S. 465, 481-82, 494 (1976), generally bars federal habeas review of Fourth Amendment claims, the court will briefly address his arguments as they are part of the ineffective assistance of counsel claim.

As set forth in the state court opinion, Hochstraser contends that the automobile exception does not apply in this case because the car was found stationary at a place regularly used for residential purposes, the apartment building's carport.  Hochstraser has cited some circuit cases that support this interpretation of *Carney*.  *See United States v. Sinisterra*, 77 F.3d 101, 104-05 (5th Cir. 1996) ("Here, the mall parking lot was not related to anyone's residence, it was open to the public and available for public use, and [defendant] had no more right in it than any member of the public."); *see also United States v. Williams*, 124 Fed. Appx. 885, 887 (5th Cir. 2005) ("[S]ome support exists for the proposition that the automobile exception does not apply when a vehicle is parked in the defendant's private driveway ...."); *see also United States v. Gooch*, 6 F.3d 673, 677 (9th Cir. 1993) ("Finally, even the automobile exception applies only

when a vehicle is on the open road or is capable of movement and is 'in a place not regularly

used for residential purposes—temporary or otherwise,'" citing *Carney*, 471 U.S. at 392.)

However, other circuits have a different interpretation of *Carney*, similar to the opinion

of the California Court of Appeal.  In *United States v. Reis*, 906 F.2d 284 (7th Cir. 1990), the

Seventh Circuit held that a defendant presenting this argument – that the exception turns on

whether the automobile's location was a residential one – misconstrued the meaning of *Carney*.

*Id*. at 290.  The Seventh Circuit stated, "*Carney* does not establish a requirement that additional

exigent circumstances be present merely because an automobile is parked at a residence."  *Id*.

at 290-91.  *See also United States v. Hatley,* 15 F.3d 856, 859 (9th Cir. 1994) (holding that the

automobile exception applied to a vehicle parked in a private driveway, even where the vehicle

was inoperable, although it was apparently mobile)*; see also United States v. Markham*, 844

F.2d 366, 368 (6th Cir. 1988) ("Although this case presents a variation on *Carney* because the

vehicle searched was parked in a private driveway, the Court finds that the *Carney* rationale is

controlling.")

As the differing circuit opinions demonstrate, the Supreme Court has not given a clear

answer to the issue regarding the automobile exception and its application when a vehicle is

found stationary at a place regularly used for residential purposes.  Therefore, the state court's

decision cannot be an unreasonable application of clearly established Supreme Court authority.

*Ponce v. Felker*, 606 F.3d 596, 604 (9th Cir. 2010) (quoting *Wright v. Van Patten*, 552 U.S. 120,

126 (2008)).  Moreover, the "circuit precedent does not constitute 'clearly established Federal

law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1)" and it "therefore cannot form

the basis for habeas relief under AEDPA."  *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012).

Circuit precedent may not be used to "refine or sharpen a general principle of Supreme Court

jurisprudence into a specific legal rule that [the Supreme] Court has not announced."  *Marshall

v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

For all these reasons, this clam is denied.

20

### 2-4.   Failure to Investigate, Obtain Witnesses and Jury Admonishment

Hochstraser contends that counsel failed to adequately investigate Dee's violent past, her daughter's mental health issues and petitioner's own bout with meningitis prior to the incident. Hochstraser presents conclusory statements that Dee had a history of violence, psychiatric problems and stalking.  However, other than presenting these statements, Hochstraser provides no additional information or specific details about this alleged violent past.  He describes his knowledge of a previous assault against Dee's previous boyfriend, but says nothing else.  As Hochstraser has failed to describe the information or evidence trial counsel should have uncovered, he cannot demonstrate deficient performance or prejudice.  Unsupported and "conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).[3]  Similarly, it is not clear how the daughter's mental health issues or Hochstraser's bout with meningitis would have been relevant to petitioner's defense.  Hochstraser has failed to offer any arguments concerning the necessity of this evidence and how the failure to present it resulted in ineffective assistance of counsel. As Hochstraser has failed to provide any information other than conclusory assertions, he cannot demonstrate a constitutional violation in that counsel was deficient and he was prejudiced.

Hochstraser's claim regarding missing witnesses is equally deficient.  He fails to specifically identify the witnesses, the subject of their testimony or how trial counsel was deficient for failing to present these witnesses.  He states that friends (he does not identify them) could have testified about his inappropriate humor regarding his statement of "losing 200 pounds"; and that a mortgage broker would have testified that Hochstraser was trying to move

---

[3] Respondent notes that in his habeas petition to the California Supreme Court, Hochstraser provided slightly more information, stating that he learned Dee physically assaulted a prior boyfriend some time before 2003.  Answer, Exh. H, Attach. A.  Even in that petition, however, Hochstraser provided no  information about the name of the boyfriend, when the alleged assault occurred or the type of assault.  This assertion, without any factual support, is insufficient.  Respondent also reasonably speculates that it was a tactical decision by trial counsel not to present evidence of Dee's alleged prior assault:  The prosecution had attempted to introduce evidence of Hochstraser's alleged rape of his ex-wife pursuant to Cal. Evid. Code 1103(b), to rebut anticipated evidence of Dee's violent character traits.  Petitioner's trial counsel was able to keep this evidence out: Because no evidence of Dee's prior bad act was introduced, the alleged rape of Hochstraser's ex-wife could not be admitted.  RT at 1190-92, 1370-74.

out, though it is not clear the relevance of this potential witness.  Hochstraser's ineffective assistance claim fails because he has not identified the witnesses and has failed to provide an affidavit outlining the contemplated testimony, or establishing that the witnesses would have testified at trial. *Allen v. Woodford*, 395 F.3d 979, 1002 n. 2 (9th Cir. 2005), *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000), *United States v. Harden*, 846 F.2d 1229, 1231–32 (9th Cir. 1988). This claim is far too speculative to warrant relief and is denied.

Regarding his claim that trial counsel failed to have the jury admonished after an objection was sustained, Hochstraser provides no argument, simply a page number of the transcript.  The prosecutor was cross-examining Hochstraser and asked him several questions regarding the coroner's testimony.  RT at 1405.  Trial counsel objected that it was not proper to have Hochstraser comment on the coroner's testimony. *Id*.  The objection was sustained, as were two more questions from the prosecutor as he attempted to re-phrase the question.  RT at 1406.  Hochstraser's argument on how trial counsel was ineffective is not clear and he does not state what type of admonishment should have been provided.  Regardless, the trial court stated the following when instructing the jury:

> During the trial, the attorneys may have objected to questions and moved to strike answers given by the witnesses.  I ruled on the objections according to the law. If I sustain an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did.

RT at 1594.

Trial counsel was not deficient nor was Hochstraser prejudiced by the lack of an admonishment, therefore this claim is also denied.[4]

C.    Prosecutorial Misconduct

Finally, Hochstraser argues that that prosecutor committed several acts of misconduct which violated his right to due process and a fair trial.

---

[4] Hochstraser also concedes  in his traverse that the missing admonishments were not ineffective assistance of counsel, but further illustrate the poor performance of trial counsel. Traverse at 6.

22

1

2        Standard

3        A defendant's due process rights are violated when a prosecutor's misconduct renders a

4    trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 183 (1986).  Under *Darden*,

5    the first issue is whether the prosecutor's remarks were improper; if so, the next question is

6    whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112

7    (9th Cir. 2005).  Factors which the court may take into account in determining whether

8    prosecutorial misconduct rises to the level of a due process violation are (1) the weight of the

9    evidence of guilt, *see United States v. Young*, 470 U.S. 1, 19 (1985); (2) whether the misconduct

10   was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir.

11   1987); (3) whether the misconduct related to a critical part of the case, *see Giglio v. United

12   States*, 405 U.S. 150, 154 (1972); and (4) whether the prosecutor's comment misstated or

13   manipulated the evidence, *see Darden*, 477 U.S. at 182.

14       Under California law, claims of prosecutorial misconduct must made at trial in order to

15   be preserved upon appeal.  *See People v. Fosselman*, 33 Cal. 3d 572, 580-81 (1983).  A

16   petitioner who fails to observe a state's "contemporaneous objection" rules may not challenge

17   the constitutionality of the conviction in federal court. *See Engle v. Isaac*, 456 U.S. 107, 129-30

18   (1982).

19

20       Analysis

21       Hochstraser contends that the prosecutor committed misconduct when he: 1) stated his

22   own opinion in closing arguments; 2) misstated the evidence to the jury; 3) used pejorative

23   references to Hochstraser; and 4) criticized defense counsel to the jury.  This claim was denied

24   without a reasoned opinion by the state court; therefore this court will conduct an independent

25

26

27

28

review of the record.[5]  *See Delgado*, 223 F.3d at 982.

      1.     <u>Opinion in Closing Arguments</u>

During closing arguments the prosecutor stated:

[PROSECUTOR]:  He's charged with murder.  **I believe we've proven him guilty** beyond a reasonable doubt.  We're going to talk about the different kinds of murder.

[DEFENSE COUNSEL]:  Your Honor, can we approach the bench, please?

THE COURT:  Yes.

(A conference was held at sidebar which was not reported.)

[DEFENSE COUNSEL]:  Your Honor, I'm going to object to the prosecutor putting his personal beliefs before this jury.  As he knows, that's improper.

THE COURT:  I understand your objection.  Is what he said–

[DEFENSE COUNSEL]:  It's improper.

THE COURT:–he said, I believe that's improper argument.  The objection is sustained. Go ahead Mr. [Prosecutor].

[PROSECUTOR]:  **I believe the evidence has shown the defendant is guilty** of murder beyond a reasonable doubt.

RT at 1517-18 (emphasis added).  Hochstraser also cited to another place in the transcript, where the prosecutor stated that "I believe the evidence has shown that it was premeditated, willful, and deliberate."  RT at 1522.  Defense counsel did not object to this statement.

     A prosecutor may not express his personal opinion of the defendant's guilt.  *United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985); *see also United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005) (government's statement of belief that defendant committed crime in summation improper, but harmless, given immediate rephrasing upon defense objection).  A prosecutor may state, "I believe that the evidence has shown the defendant's guilt . . . . but he may not state, I believe that the defendant is guilty."  *United States v. Morris*, 568 F.2d 396, 402

---

     [5] In several instances, Hochstraser only cites to page numbers in the transcript but it is not clear what specifically he is referring to and how exactly the prosecution misstated the evidence or used pejorative terms.  The court has attempted to ascertain his specific arguments when possible.  The court has also looked to the merits of claims that were not objected to during trial.

1  (5th Cir. 1978) (quotations and citations omitted).

2  While it was not proper for the prosecution to state, "I believe we've proven him guilty"

3  Hochstraser has failed to show that the prosecution's few statements infected the entire trial with

4  unfairness.   Other than identifying these statements, Hochstraser has failed to present any

5  arguments concerning how the statements prejudiced him.   His conclusory allegations are

6  insufficient and a review of the record reveals that these isolated comments do not rise to the

7  level of a due process violation. *See Powell v. Hatcher*, 407 Fed. Appx. 226, 227–28 (9th Cir.

8  2011) (when prosecutor addressed evidence in terms of what "I believe happened," prosecutorial

9  misconduct claim failed because petitioner "did not show that the improper comments expressing

10  the prosecutor's personal opinions about her guilt materially affected the verdict or denied her

11  a fair trial.").

12

13  2.   Misstating the Evidence

14  Hochstraser contends that the prosecution misstated the evidence on several occasions,

15  though there was only one objection from trial counsel.   When the prosecution referred to body

16  parts having been found with clothing in one of the plastic bins, trial counsel objected, noting

17  that there were no body parts found in the specific bin the prosecution was referring to.   RT at

18  1529.   However, it is undisputed that body parts were found in the other bins and bags.   While

19  the prosecution may have misstated the evidence concerning which specific bin contained body

20  parts, any error was harmless.

21  Hochstraser also contends that the prosecution misstated the evidence by stating, "[w]hen

22  you hit someone with a heavy metal object, it shows intent to kill.   No once, not twice, not three

23  times.   Over and over and over.   As shown by the coroner, there are multiple fatal wounds

24  causing the depressed skull fracture."   RT at 1524.   Hochstaser's claim fails as his own

25  testimony indicated that he may have hit the victim up to four times with the metal bar.   RT at

26  1408-09.   Nor is there merit to this argument that the prosecution erred by stating that hitting

27  someone with a heavy metal object shows intent to kill.   It was a reasonable inference for the

28

prosecution to draw, since Hochstraser hit the victim in the head up to four times with a heavy metal bar that resulted in severe head injuries and her death. A prosecutor does not commit misconduct by making reasonable inferences from the evidence at trial, even if the defendant disputes those inferences. *See United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000).

### 3.    Pejorative References

Hochstraser argues that the prosecution made several pejorative references to him, though he does not cite specifically to all of them and the court was unable to find anything that could be considered pejorative on most of the transcript pages he has identified. In one instance the prosecution stated, "What else didn't make sense about defendant's story? He says that Dee punched him in the face on Sunday morning knocking his glasses off. We heard all kinds of testimony from him about that. He was blind, he couldn't see without his glasses. Forget the fact the he seemed to have selective vision. One minute he was exactly sure where she was standing, where she fell. He seemed to have be able to hit her with precision in the same place on the face over and over, yet he couldn't see anything because he was blinded." RT at 1530-31.

In another instance, the prosecution stated that Hochstraser had a "dark side." RT at 1536. Hochstraser concludes these statements violated his due process rights but provides no arguments in support. Unsupported and "conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." *James*, 24 F.3d at 26.

The prosecution's statements about Hochstraser are insufficient to warrant habeas relief and a review of the records shows that the statements did not infect the trial with unfairness even assuming the statements were inappropriate. *See Dubria v. Smith*, 224 F.3d 995, 1004 (9th Cir. 2000) (prosecution may express opinions about the veracity of a defendant's story); *see also United States v. Warren*, 25 F.3d 890, 895 (9th Cir. 1994) (the interpretation of defendant's statements is a proper matter for prosecution argument).

4.      Criticism of Defense Counsel

Finally, Hochstraser argues that the prosecution made inappropriate comments to the jury regarding defense counsel.

A prosecutor may not gratuitously attack a defendant's choice of counsel or defense counsel's integrity and veracity.  *See Bruno v. Rushen*, 721 F.2d 1193, 1195 (9th Cir. 1983) (prosecutor's comments equating defendant's hiring of counsel with guilt and comments attacking integrity of defense counsel without evidence improper and error of constitutional dimension).  Nor may the prosecutor attack defense counsel's legitimate trial tactics.  *See United States v. Frederick*, 78 F.3d 1370, 1379-80 (9th Cir. 1996) (prosecutor's back-handed compliment to defense lawyer for confusing witness, which appeared to imply that his methods were somewhat underhanded and designed to prevent truth from coming out, was improper but not alone reversible error).  However, there is no constitutional error unless the comments were prejudicial to the point of denying the defendant a fair trial.  *See, e.g., Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998) (prosecutor's charge that defense counsel intentionally introduced defendant's testimony knowing that defendant would not submit to cross-examination and that testimony would be stricken did not have a substantial and injurious effect on the jury where evidence of guilt was overwhelming).

During closing arguments, the prosecution stated the following:

> But when the evidence is against you, you don't want to talk about the evidence so you got to do something [to] divert the jury into thinking about something else that isn't the facts.

> Second, what do you do? You cry conspiracy. It's a police conspiracy, ladies and gentlemen.  That's what we have here.  He's made a big, big show about this girdle.  Isn't it really convenient on his part to say that the one thing that he says doesn't exist is a lynchpin of our case?  I'm not afraid to talk about this either, ladies and gentlemen.  Let's take a look at these items.  And I'm going to read from the same document that [defense counsel] read from. Exact same document. Same coroner's report here.  Coroner said they provided a garbage bag containing a blood soaked white terry cloth robe labeled Cannon 100 percent cotton and a brown paper bag containing a pair of black nylon lady's underwear cut open at the sides.  We have that.  Labeled sexy, sensual, lacique that demonstrate abundant adherent tissue fragment.  And he told us he felt that was underwear that the victim was wearing that was cut off by the [petitioner] before the dismemberment.

> And then let's just talk about this for a minute.  Because someone calls an item a

girdle doesn't necessarily make it a girdle.  There are lots of names for different things.  Some people might call something lingerie, some people might call something panties, somebody might call it a brassiere.  The last thing they call a nylon girdle labeled Realware, 18 to 20, that is cut open at the back.  You're going to see we have an item which is labeled Realware, 18 to 20, that is cut open at the back.  We have everything that's mentioned in here.  All they do is make a mistake calling it a girdle.  Somebody might call it a girdle, somebody might not call it a girdle.  We don't have any missing items.  There are not three items.  I can't make it any clearer than this.  He's trying to throw you off.  This a typical defense tactic.

He doesn't want you to think about the facts in this case.  We have a towel, number one, we have two other black items.  We have this here, which is a tank top, and then we have this here, which is the underwear. Okay.  Three items.  Three items in there, three items on here.  If there was a missing girdle, we wouldn't have enough items.  We have three items.  Three items are being accounted for. It's all a matter of what you're calling it. There's no missing item.  I don't want there to be any mistake about this. [Defense counsel] is trying to lead you off the path.  He's trying to throw you off your game.  This is a total red herring.  And I'm not hiding behind anything.  There is absolutely no police conspiracy here.

RT at 1583-85.

Later the following statements were made:

What's the other thing about what—the other diversionary tactic that defense loves to use when the evidence is devastating to them?  They love to talk about how great their client is, what a wonderful guy his client is, what a great father and how he liked to go to the park, this, that, and the other.  What a great, wonderful guy he was.

RT at 1587.

Hochstraser has failed to meet his burden in showing that these comments infected the trial with unfairness.  The Ninth Circuit has held that a prosecutor's characterization of defense counsel's argument as "trash" could not be characterized as improper because "[a] lawyer is entitled to characterize an argument with an epithet as well as a rebuttal". *Williams v. Borg*, 139 F.3d at 745.  In this case, the prosecution was referring to the arguments of defense counsel, not defense counsel himself and nothing the prosecution stated was more egregious than what was allowed in *Williams*.  This claim is denied.

D.    A Certificate of Appealability Will Issue

Petitioner has "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and reasonable jurists would find debatable the district court's assessment

28

of petitioner's sufficiency of the evidence claim.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is GRANTED on the sufficiency of the evidence claim.  A certificate of appealability will not issue as to the remaining claims because reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong."  *Slack*, 529 U.S. at 484.  Petitioner is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

## CONCLUSION

The petition for writ of habeas corpus is denied on the merits.

The clerk will close the file.

**IT IS SO ORDERED.**

DATED: August 6, 2013

_____
SUSAN ILLSTON
United States District Judge